## BY THE

## ST. LOUIS, KANSAS CITY AND SPRINGFIELD

# COURTS OF APPEALS

### AT THE

## OCTOBER TERM, 1915.

---

PEOPLE'S STATE SAVINGS BANK, Respondent,
v. MISSOURI, KANSAS AND TEXAS RAIL-
WAY COMPANY et al., Appellants.

**St. Louis Court of Appeals, July 2, 1915. Motion for Rehearing
Overruled November 2, 1915.**

1. **COMMON CARRIERS: Conversion of Shipment: Change of
Billings: Improper Delivery.** A connecting carrier, with the
consent only of the attendant, who had no authority to give
such consent, changed the billing of a shipment, from a con-
signment to the shipper at destination, "shipper's order, notify
C. Bank," to a straight consignment to C. Bank, and the initial
carrier, with knowledge of this change of billing, turned the
shipment over to the connecting carrier. *Held,* that the car-
riers were guilty of a joint conversion of the shipment—the
connecting carrier because it changed the billing, and the initial
carrier because it acceded to the change and delivered the
shipment to the connecting carrier with knowledge thereof;
following S. C. 158 Mo. App. 519.

2. ————: ————: **Measure of Damages.** The measure of dam-
ages for the conversion of a shipment by a carrier is the value
of the goods at destination, less the cost of transportation, with
interest, under Sec. 5430, R. S. 1909, if the jury sees fit to
give it.

192 App.]                    (614)

3. ————: ————: **Effect on Limitations of Liability.** A carrier's conversion of a shipment deprives it of the benefit of provisions in the shipping contract, requiring the shipper to present notice of his claim within a certain time, and limiting the carrier's liability to a certain sum, since, as a result of the tort, the law creates a new relation between the parties independent of the contract.

4. **PAYMENT: Taking Promissory Note for Debt.** The taking of a promissory note for an antecedent debt does not extinguish the indebtedness, unless an agreement to that effect is made at the time.

5. **PLEDGES: Common Carriers: Conversion by Carrier: Right of Pledgee to Maintain Action.** After a bill of lading had been pledged by the shipper to secure a debt, the pledgee took a promissory note from the pledgor for the indebtedness, without any agreement for extinguishment of the indebtedness, and thereafter made an agreement with a third person, whereby the latter took this note to hold until money he then loaned the pledgee was repaid to him from the expected recovery in a then-pending action by the pledgee against the carrier for conversion of the shipment for which the bill of lading was given. *Held*, that the pledgee's right to maintain the action was not lost by reason of these transactions, since the taking of the note did not operate to extinguish the indebtedness for which the bill of lading was pledged, for the reason that no agreement that it should so operate was made at the time, and since there was no sale of the note in the second transaction, but the note was merely given into the possession of the third party to hold as evidence of the agreement.

6. **COMMON CARRIERS: Conversion of Shipment: Waiver by Shipper: Effect on Pledgee of Bill of Lading.** Where a shipper of live stock, consigned to his own order, pledged the bill of lading to secure an indebtedness, a waiver by the shipper, who did not represent the pledgee, of the carrier's conversion of the shipment did not affect the right of the pledgee to recover against the carrier, to the extent of his interest.

7. **CONVERSION: Interest.** In an action for conversion, the jury may, in their discretion, under Sec. 5430, R. S. 1909, give damages, in the nature of interest.

8. **COMMON CARRIERS: Conversion of Shipment: Parties: Pledgee of Bill of Lading.** One to whom a bill of lading is negotiated as collateral security for a debt is the proper party to sue for the entire loss from conversion of the shipment by the carrier, as the bill of lading is indicia of title and operates to transfer the entire property; but as to the recovery by the pledgee above his interest, he stands to the pledgor in the relation of trustee of an express trust.

9. **WAIVER: Essentials.** Waiver depends on knowledge of the facts and is to be found from the intention of the party.

10. **COMMON CARRIERS: Conversion of Shipment: Waiver.** In an action against a carrier for the conversion of a shipment of horses by changing the billing, *held* that the question of whether the conversion was waived by the shipper, by his receiving the horses and paying the freight, was a question of fact for the jury, since the evidence was not conclusive as to his knowledge of the conversion at the time he received the shipment and paid the freight.

11. **WAIVER: Right to Recall.** A waiver once made cannot be recalled.

12. **COMMON CARRIERS: Pledges: Conversion of Shipment: Recovery by Pledgee of Bill of Lading: Expenses of Suit.** In an action against a carrier by the pledgee of a bill of lading, for conversion of the shipment, the pledgee is entitled to recover, so long as such recovery does not exceed the value of the shipment, not only the amount of the debt secured by the pledge, but also the expenses of litigation, notwithstanding a waiver of the conversion by the pledgor, preventing a recovery for his use after satisfying the secured debt, for the reason that the pledgee sues as trustee, to the end of rendering the collateral security available in liquidation of the indebtedness secured.

Appeal from St. Louis City Circuit Court.—*Hon. Williams T. Jones*, Judge.

REVERSED AND REMANDED.

*J. W. Jamison* for appellant, Missouri, Kansas & Texas Railway Company.

*H. R. Small* for appellant, Louisville & Nashville Railroad Company.

*James A. Seddon* and *James R. Van Slyke* for respondent.

NORTONI, J.—This is an action in trover as for the conversion of nine head of horses. Plaintiff recovered, and defendants prosecute the appeal.

Plaintiff is an incorporated banking institution at Coffeyville, Kansas, and defendants are common carriers engaged in the transportation of live stock. The suit proceeds for the conversion of nine head of horses shipped over defendant Missouri, Kansas & Texas Railway Company's road via the Louisville & Nashville Railroad and subsequent carriers, to Batesburg, South Carolina. The conversion revealed in the evidence occurred at East St. Louis, Ill., through the Louisville & Nashville Railroad's changing the billing of the consignment and the delivery to it by the Missouri, Kansas & Texas Railway under such changed billing, in violation of the shipping instructions. Plaintiff, People's State Savings Bank, of Coffeyville, Kansas, held the bill of lading for the shipment, having received it through negotiation by McNulty, the shipper, for an advance of $1500. However, the bank sues, as is proper, for the entire loss entailed, and the recovery allowed by the jury is in the amount of $5056—that is, the value of the nine head of horses at Batesburg, South Carolina, including interest thereon. So much of the recovery as is over and above the interests of the plaintiff bank, the evidence reveals, is to go to McNulty, the shipper.

It appears that John McNulty was engaged in the business of buying and shipping horses at Coffeyville, Kansas, and was a patron of plaintiff bank. The bank furnished him the money, $1500, with which to purchase the horses involved. About April 25, 1906, McNulty shipped the nine horses from Coffeyville over the defendant Missouri, Kansas & Texas Railway, under a contract providing for delivery to the Louisville & Nashville Railroad Company as connecting carrier at East St. Louis, Illinois, through the National Stockyards Company, and from thence by subsequent carriers—that is, the Georgia Railway at Atlanta, Georgia, and the Southern Railway Company at Augusta, Georgia—to Batesburg, South Carolina. The ship-

ment so made was consigned by McNulty, the shipper, from Coffeyville, Kansas, to the order of himself, as consignee, at Batesburg, South Carolina, with notice to the Citizens' Bank of Batesburg, to which the bill of lading was forwarded by plaintiff bank with a draft for $1500 attached. In other words, the shipment was made by McNulty, consignor, to himself, consignee, at Batesburg, South Carolina, shipper's order, notify Citizens' Bank at Batesburg. On delivering the shipment of horses to the Missouri, Kansas & Texas Railway Company at Coffeyville, that company issued to McNulty a bill of lading therefor, as above stated, and this bill of lading was immediately negotiated by McNulty, through assigning it to plaintiff, People's State Savings Bank, of Coffeyville, for the consideration of $1500 —that is, the money advanced by the bank to him which was employed in purchasing the horses.

An arrangement was entered into between McNulty and the railroad company, however, whereby one Claude Coverdale was to accompany the shipment as a caretaker, and a live stock shipping contract, which included a pass for Coverdale, the caretaker, was issued to McNulty; but plaintiff bank was in no wise committed by this contract. Plaintiff bank, having received the bill of lading issued to McNulty, shipper's order, notify Citizens' Bank, Batesburg, South Carolina, drew a draft on McNulty at Batesburg for $1500, attached the original bill of lading thereto, and forwarded both to the Citizens' Bank, Batesburg, South Carolina, for collection from McNulty, on the consignment reaching there. Coverdale accompanied the shipment under his pass in connection with the live stock contract, which he carried with him, and on arriving in East St. Louis, defendant Louisville & Nashville Railroad Company declined to accept the shipment for transportation because it was billed to McNulty, consignee, shipper's order, notify Citizens' Bank, Batesburg, for that it had a standing rule against receiving

shipments thus made. The shipping directions contained on the original bill of lading held by plaintiff bank and so sent forward by it, together with the draft to Batesburg, South Carolina, are as follows:

"Marks, Consignee and Destination: Order John McNulty, Batesburg, S. C. Notify Citizens Bank. c/o L. & N. at E. St. Louis. c/o Ga. Ry. at Atlanta. c/o Sou. Ry., Augusta."

The evidence tends to prove, also, that the live stock contract issued to McNulty, and which was carried by Coverdale, the attendant, likewise stipulated a shipment of the stock over the Missouri, Kansas & Texas, and delivery by it to the Louisville & Nashville at East St. Louis.

On the shipment reaching the National Stockyards at East St. Louis, Illinois, it was tendered to the Louisville & Nashville, but refused, because of the billing, shipper's order, as above stated. Thereupon the Missouri, Kansas & Texas Railway Company endeavored to communicate the information by wire to John McNulty at Coffeyville, Kansas, that the Louisville & Nashville Railroad Company would not accept the horses, shipper's order, notify, but was unable to reach him, as McNulty had left Coffeyville for Batesburg in order to meet the shipment on its arrival. But finally, after the shipment had been held a couple of days at the National Stockyards, East St. Louis, the Missouri, Kansas & Texas Railway agent at Coffeyville called on the president of the bank and endeavored to induce him to consent to a change in the billing so the Louisville & Nashville would accept the horses for transportation. Mr. Woodward, the president of plaintiff bank, declined to do this, for he said such would release the bank's security.

In the interim, negotiations were pending between Mr. Timberlake, the agent of the Louisville & Nashville, and Coverdale, the attendant, and the agents of the Missouri, Kansas & Texas, with respect of this mat-

ter. Finally, on Sunday, Timberlake, the agent of the Louisville & Nashville at East St. Louis, entered into a new contract of shipment with Coverdale, the attendant, in the name of McNulty, whereby the original billing of the shipment was changed from McNulty, consignee, notify Citizens' Bank, Batesburg, to a straight consignment of the horses to the Citizens' Bank, at Batesburg, South Carolina, and Coverdale surrendered to him the live stock contract in his possession. Under this new shipping contract, different and distinct in this material respect from that originally issued by defendant Missouri, Kansas & Texas Railway Company, the Missouri, Kansas & Texas delivered the shipment, through the agency of the National Stockyards, to the Louisville & Nashville Railroad Company, and the Louisville & Nashville carried it forward. About four days later the horses arrived at Batesburg, South Carolina, it is said on May 3d or 4th, during the night, being delivered there by the Southern Railway Company, the final carrier. McNulty had preceded the shipment, and was stopping at a hotel awaiting its arrival. The following morning, between seven and eight o'clock, and before the arrival of the agent of the Southern Railway Company at his office, McNulty and Coverdale opened the car and unloaded the horses into a pen by the side of the railroad tracks. The horses seemed to be sick, and one of them, a valuable stallion, quite so.

On the arrival of the agent for the Southern Railway Company at his office, probably between eight and nine o'clock in the morning, he discovered the billing issued by the Louisville & Nashville Railroad Company at East St. Louis, covering the shipment to the Citizens' Bank at Batesburg as consignee, and called upon the cashier of the bank for the payment of the freight. The cashier of the Citizens' Bank notified the agent of the Southern Railway Company that the bank was in no wise connected with the shipment—that

is to say, it knew nothing of the arrangement whereby it was made consignee—but said he held a draft on McNulty with a bill of lading attached, and referred the agent to him. Craps, the agent of the Southern Railway, then called upon McNulty and requested him to pay the freight. He also suggested to McNulty that he ought to pay the draft in the bank, though, of course, the agent of the Southern Railway Company was interested only in the collection of the freight, as the consignment then stood, for it was a straight consignment to the Citizens' Bank, without regard to McNulty, shipper's order, notify. However, McNulty then had the horses in his possession, and later in the day placed them in the Rutland livery stables, across the street. McNulty parleyed with Craps, the agent of the Southern, and complained of the condition of the horses, saying in all probability the most valuable one, the stallion, would die, and, if he did, he would decline to pay the draft. But, as before said, Craps, who was not particularly interested in the payment of the draft, insisted throughout the day on the collection of the freight. The Citizens' Bank had declined to pay the freight, because it was not properly the consignee, and was, therefore, not thus concerned in the shipment, which, according to its instructions, was made to McNulty to be delivered to him upon McNulty's paying the draft of $1500 held by it for collection and attached to the original bill of lading. The Citizens' Bank was, of course, not the agent of plaintiff, except to collect the draft and deliver the bill of lading on its payment. But, as McNulty had gotten possession of the horses without payment of the draft, he retained them and parleyed the matter of the draft to see what the result would be in the case of the sick stallion.

Later in the day—that is, the day the horses were unloaded—McNulty paid the freight to the agent of the Southern Railway Company, something over $230, and took his receipt therefor. He retained possession of

the horses for several days, and during this time the stallion died. It is said this horse was a valuable one. While the horses were in McNulty's possession at Rutland's barn, he sold one of them and retained the money. Some two or three days afterwards, McNulty rejected the shipment entirely, and turned the horses over to the Southern Railway Company, through an arrangement with Mr. Adams, its live stock agent, whereby there was substituted another horse in lieu of the one which McNulty had sold. The Southern Railway Company afterwards advertised the horses and sold them, and plaintiff's draft was returned to it unpaid.

It appears this case has been pending for about seven years, and the judgment appealed from is that given in the third trial. On the first trial, the court directed a verdict for defendants, and an appeal was prosecuted by plaintiff to this court. The judgment was reversed, and the case remanded for further proceedings, as will appear by reference to People's State Savings Bank v. Missouri, K. & T. R. Co. et al., 158 Mo. App. 519, 138 S. W. 915. On the second trial, plaintiff prevailed before a jury, and the court set the verdict aside. On the third trial, plaintiff prevailed again, and the two defendants prosecute the present appeal. There are many arguments advanced in the briefs for a reversal of the judgment, and it would unduly extend the opinion to treat with them separately. However, we have thoughtfully considered every argument put forward and all features of the case. After so doing, it appears to be clear, as a conclusion of law, that, on all the evidence, plaintiff is entitled to recover, at least to the amount of its interest and the expense of the suit, while, in so far as McNulty is concerned, in whose favor a recovery beyond the interest of the bank inures, the matter is enveloped in considerable doubt, for that the evidence tends to prove he ratified the act of conversion through receiving the horses, paying the

freight, selling one of them, and retaining all for several days until he changed his mind.

It is argued on the part of defendant Missouri, Kansas & Texas that it was not a party to the conversion, for the reason its contract of carriage terminated with its rails at St. Louis, Missouri, while the conversion actually occurred at East St. Louis, Illinois, on the other side of the river. But obviously the fact is otherwise. The record abounds with evidence tending to prove that the Missouri, Kansas & Texas Railway actually delivered the consignment of horses through the National Stockyards, as its agent, to the Louisville & Nashville Railroad Company at East St. Louis, and that its agent knew of the change in the billing at the time; but, aside from all of this, we construe the shipping contract, as a matter of law, to impose the obligation of delivery by the Missouri, Kansas & Texas Railway Company to the Louisville & Nashville Railroad Company at East St. Louis. Such was the conclusion on the former appeal, and on reconsideration no reason is perceived to recede from it. It appears beyond question that the Louisville & Nashville Railroad Company, with knowledge of the true state of the billing, interfered therewith by entering into a new contract through the medium of Coverdale, the attendant, who was in no wise authorized to represent plaintiff bank, and changed the consignment so as to make it a straight consignment to the Citizens' Bank at Batesburg, South Carolina, instead of a consignment to McNulty, notify Citizens' Bank. Here a joint tort appears in which both defendants participated. The Louisville & Nashville offended affirmatively through interfering and changing the billing in order to get possession of the property for shipment over its lines, and defendant Missouri, Kansas & Texas offended in acceding thereto, by delivering the shipment to the Louisville & Nashville, without regard to the shipping directions which

were parcel of its contract—no doubt for the purpose
of getting rid of the horses thus for several days on its
hands in the National Stockyards. Such constituted a
conversion at East St. Louis, Illinois, through the joint
tort of both defendants, and both are liable to plaintiff
for the loss. Plaintiff bank was in no wise represented
in the new contract of shipment entered into between
the Louisville & Nashville and Coverdale, the attend-
ant, at East St. Louis, and, indeed, the bank, on appli-
cation to it, had refused to consent that such a change
of billing might be made. The joint tort of conversion
is clear, and may not be questioned. We so declared
on the former appeal, as will appear by reference to
People's State Bank v. M., K. & T. R. Co., 158 Mo. App.
519, 138 S. W. 915.

But it is argued by defendant Missouri, Kansas &
Texas that its live stock contract issued at Coffeyville,
Kansas, to McNulty in connection with the shipment,
and which was carried forward by Coverdale, as evi-
dence of his right to be transported with the horses,
provides: First, that in event of a suit against it for
loss or damage the measure of damages shall be ascer-
tained by reference to the value of the property at the
place of shipment; and, second, that no suit may be
maintained on account of the shipment unless notice is
served on defendant within thirty days after the loss
occurs. The court permitted a recovery for the value
of the property at the destination of the consignment,
and such was proper. [See Spencer v. Vance, 57 Mo.
427; Blackmer v. Cleveland, C., C., etc., R. Co., 101
Mo. App. 557, 73 S. W. 913.] The measure of damages
in this form of action against the carrier—that is, as
for conversion—is the value of the goods at the place
of destination, less the cost of transportation, and with
interest thereon, under our statute, if the jury sees
fit to give it. [See 3 Hutchinson on Carriers (3 Ed.),
sec. 1374.] Of course, the rights of plaintiff bank are

not to be measured by the live stock contract, in any view of the matter, for it was not a party thereto, and, indeed, was without information concerning it. But, though such be the fact, McNulty, the shipper, executed that contract with the Missouri, Kansas & Texas Railway Company at the time he received the bill of lading to be negotiated to plaintiff bank. This being true, ordinarily the two contracts should be construed together, in so far as McNulty's rights are concerned, in a case proceeding on a breach of the common-law liability of the carrier. But the rule is not the same where a conversion appears and the suit proceeds as in trover therefor. In such cases the tort involved in the conversion operates to dispel the beneficial provisions of the contract of shipment vouchsafing special privileges and rights to the tortfeasor and remits the matter to be reckoned with on the obligation of an insurer. Because of the tort, the law immediately creates a new relation between the parties independent of the contract, in that the carrier is deemed to have abandoned the contract of shipment. In this view, it is, therefore, said he may not thereafter insist upon a stipulation that his liability shall be limited to a certain sum. [See 1 Hutchinson on Carriers (3 Ed.), sec. 432 et seq.] So, too, where the carrier is guilty of a conversion of the goods, he cannot escape liability on the ground that the owner failed to present a notice of his claim according to the terms of the shipping contract. [See 1 Hutchinson on Carriers (3 Ed.), sec. 445.]

Both defendants argue that no recovery may be allowed to plaintiff bank, for the reasons: First, that it appears McNulty discharged the indebtedness, on account of which the original bill of lading was pledged to it, through subsequently executing a note for something over $1950 to the bank; and, second, that the bank is no longer a party in interest, for the reason it sold such note so executed by McNulty.

192 App. 40

It appears that some time after the conversion, McNulty owed plaintiff bank somewhere about $450, in addition to the $1500 for which he had assigned the bill of lading to it. The bank was in straits, and the bank examiner of the State of Kansas insisted that something should be done to make this indebtedness more certainly appear in the assets of the bank. Because of this, the officers of the bank induced McNulty to execute a note to it for $1950 and some odd dollars, merely for the purpose of holding such note among the assets of the bank, but without any agreement as to the extinguishment of the original indebtedness for which the bill of lading was taken. Subsequently the bank needed money forthwith, and Mr. Woodward, its president, together with one of his sons, the cashier, made an arrangement with Mr. O. D. Woodward, another son of the elder Woodward, president of the bank, and a brother of the cashier, whereby O. D. Woodward advanced $2000 to the bank and took McNulty's note, it is said, to hold until that amount was repaid.

Obviously the arguments put forward on these facts avail nothing. In the first place, the mere taking of a promissory note for an antecedent debt does not operate to extinguish the indebtedness, unless an agreement is made to that effect at the time. [See McCormack Harvesting Mach. Co. v. Blair, 146 Mo. App. 374, 124 S. W. 49; Shotwell v. Munroe, 42 Mo. App. 669; State ex rel. Crider v. Wagers, 47 Mo. App. 431; Night & Day Bank v. Rosenbaum, 191 Mo. App. 559, 177 S. W. 693.] Secondly, in so far as the transfer of the McNulty note by plaintiff bank to Mr. O. D. Woodward is concerned, the evidence in no wise suggests a sale of it. On the contrary, it was given into possession of Mr. O. D. Woodward merely to hold as evidence of the transaction by which he advanced $2,000 to his father and brother for the benefit of the bank, with an agreement between them that the money realized from this

suit being prosecuted by the bank should be paid, in liquidation of the indebtedness thus created, to O. D. Woodward, if the bank finally recovered sufficient for that purpose.

But it is urged on the part of both defendants that, though such be true, plaintiff bank cannot recover here, because of the conduct of McNulty in taking possession of the horses at Batesburg, South Carolina. Touching this matter, it is said that plaintiff bank is not chargeable with the conduct of McNulty, for he in no wise represented it. Indeed, he was its debtor, and, under the original billing of the shipment entered into at Coffeyville, the horses were to come into possession of McNulty only upon his procuring possession of the bill of lading—that is, paying the draft of $1500 attached thereto at the Citizens' Bank and then presenting the bill of lading to the agent of the Southern Railway Company there. Had the billing gone through as originally provided, the agent of the Southern Railway Company would have been interested in seeing the draft was paid at the Citizens' Bank, and that company rendered liable as for conversion, if it permitted McNulty to take the horses without first requiring such payment to be-made. Through changing the billing at East St. Louis, as was done by the Louisville & Nashville Railroad Company, with the knowledge and consent of the Missouri, Kansas & Texas, the Citizens' Bank at Batesburg was made the consignee, and, as it appeared to the agent of the Southern at Batesburg, entitled to the horses on payment of the freight only. In this situation, Craps, the agent of the Southern at Batesburg, was interested in the collection of the $230 freight charges, rather than both the freight and the $1500 draft as well; therefore he called upon the Citizens' Bank for the freight, and the bank informed him it was not concerned in the shipment, save that it had a draft on McNulty—that is, the bank was not concerned

as consignee in the payment of the freight. McNulty was then in possession of the horses, and the agent of the Southern called upon him, as it had the bank, for payment of the freight, but in the conversation told him of the draft at the Citizens' Bank, and suggested he should pay it. However, in the billing as it appeared in the office of the Southern Railway Company, its agent was justified in surrendering possession of the horses on receiving the freight charges. During the day McNulty paid the freight charges and retained the horses, leaving the draft unpaid in the bank. Even though the freight charges were paid to the Southern Railway agent several hours after McNulty obtained possession of the horses, such amounted to a ratification on the part of the Southern Railway Company as if it had delivered the horses to McNulty on his merely paying the freight. Then, too, touching this, the Southern Railway Company is to be regarded as the agent of defendants, for after the conversion at East St. Louis they are to be treated as insurers. From this it appears that McNulty, plaintiff's debtor, came into possession of the horses as a direct result of the change in the shipping contract made at East-St. Louis between the two defendants, and plaintiff bank suffered loss accordingly, for that its draft was not required to be paid before possession was given to McNulty. However, it is not essential that plaintiff's loss shall result directly from the wrongful conversion, for after that is accomplished defendants stand as insurers. Moreover, when the conversion is established, nothing thereafter done by defendants will relieve them from liability therefor, though it is said a return, or offer to return, the property may be considered in mitigation. [Marshall v. Kansas City, etc., R. Co., 176 Mo. 480, 492, 75 S. W. 638; Sparks v. Purdy, 11 Mo. 219.] This being true, it is entirely clear that plaintiff bank is entitled to recover, and this, too, notwithstanding the fault of McNulty, for he in no wise represented it.

But the right of plaintiff bank to recover in this suit more than enough to compensate its indebtedness of about $1500, together with the legitimate expense and cost of suit, is not so clear, for beyond this the recovery, if at all, is in favor of McNulty. The evidence tends with great force to show that McNulty waived his right to pursue defendants as for a conversion, but we regard this matter as a question for the jury. It appears that the jury found in favor of plaintiff not only for the value of the horses, but added interest as well, under proper instructions touching that matter, as is competent in conversion, under our statute, according to the established rule of decision. [See State ex rel. v. Hope, 121 Mo. 34, 25 S. W. 893.] The amount of the verdict, including the nine head of horses and interest so found, is $5056, whereas the bank's interest is but $1500, together with interest thereon and expense of suit. It is true plaintiff bank, as holder of the original bill of lading negotiated to it, is the proper party to sue for the entire loss, in that the bill of lading is indicia of title and operates to transfer the entire property to it; but the evidence detailed in the testimony of the officers of the bank and also by McNulty reveals conclusively that so much of the recovery as is had over and above an amount sufficient to compensate the bank is to be accounted for by plaintiff bank to McNulty. Touching this, of course, the bank stands in the relation to McNulty as a trustee of an express trust within the purview of our statute, and, though it may recover the whole, the balance, after statisfying its own claim, inures to McNulty, which he may recover from it.

But if this suit proceeded on the part of McNulty as plaintiff, rather than the bank, his right to recover would depend on the finding of the jury as to whether or not he waived the conversion and ratified the wrongful acts of defendants through accepting the horses, paying the freight, and retaining possession and sell-

ing one of them before he rejected the whole. The evidence is not conclusive on this matter; for, though it appears that McNulty took possession of the horses in the morning, before the station agent of the Southern Railway Company reached his office, it does not certainly appear that he knew of the conversion at that time. The evidence affords an abundant inference however tending to show that he did. But, as said, this is not sufficient to conclude the matter. Waiver depends on knowledge of the facts, and is to be found from the intention of the party. [See Francis v. Sup. Lodge, A. O. U. W., 150 Mo. App. 347, 130 S. W. 500.] There is evidence, too, tending to show that McNulty took possession of the horses because of their weak and sick appearance, with a view of bettering their condition, rather than for the purpose of accepting the shipment notwithstanding the conversion of defendants which had occurred at East St. Louis; also that he sold one of them in the interim, with the consent of Adams, the live stock agent of the Southern Railway Company, but this was replaced by another under an agreement with the same live stock agent on turning the horses back. McNulty says he informed Craps, the agent of the Southern Railway Company, that if the stallion died, he would not accept the shipment. It appears, too, from his testimony that he refused to pay the draft in the Citizens' Bank until the result of the sickness of the stallion was ascertained.

If McNulty knew of the conversion at the time he took possession of the horses and paid the freight thereon, and notwithstanding took them as his own— that is, for the purpose of disposing of them—then the jury may find that he waived his right to complain of the conversion. If it be found as a fact in the case that he so waived the conversion as by ratifying it, no recovery should be allowed in his favor, in this suit. The principle is amply illustrated in the following cases:

Woolston v. Southern Ry. Co., 177 Mo. App 611, 160 S. W. 1023; Southern Ry. Co. v. Kinchen, 103 Ga. 186, 29 S. E. 816; Blowers v. Canadian Pac. R. Co. (C. C.), 155 Fed. 935; 38 Cyc. 2009, 2042. If it be found that he took possession of the horses as his own with knowledge of the conversion which had theretofore occurred, intending to sell them, and thus waived his right to complain of the conversion, the mere fact that he afterwards changed his mind when the stallion died, and insisted on turning them over to the Southern Railway Company, will not suffice to reinstate his rights in the premises. A waiver once made may not be recalled. [See Porter v. German Am. Ins. Co., 62 Mo. App. 520; Carp v. Queen Ins. Co., 116 Mo. App. 528, 92 S. W. 1137; Bange v. Supreme Council Legion of Honor of Missouri, 153 Mo. App. 154, 132 S. W. 276.]

However this may be with respect to the right of plaintiff bank to recover as a trustee to the use of Mc-Nulty, it is entirely clear that plaintiff is entitled to recover the amount of its original indebtedness for which the bill of lading was negotiated to it—that is, about $1500, and interest thereon—and also, if the value of the horses converted be found beyond that sufficient, the legitimate expenses of this suit, for it sues here as a trustee, to the end of preserving the collateral security held by it for the indebtedness above referred to. Of course, as a mere attribute to the right of recovery as for conversion, one may not have attorney's fees and other legitimate expense of the litigation included as an element of damages, but the instant case presents another and distinct feature, in that plaintiff is suing as a trustee, to the end of rendering the collateral deposited with it by McNulty available for the purposes originally contemplated, and the litigation entailed because of the tort of defendants concerns a trust fund equal to the full value of the collateral security converted, when viewed from the standpoint of plaintiff.

Plaintiff is, therefore, entitled to recover of defendant, not only the amount of the original indebtedness of Mc-Nulty, together with interest thereon, but likewise the reasonable expenses of prosecuting the suit—that is, including attorney's fees, the taking of depositions, and other legitimate matters of expense—provided, however, that the value of the horses converted be found to exceed the amount of plaintiff's claim of $1500, and interest, for which the bill of lading was negotiated, so as to create a trust fund to the use of McNulty. The full value of the collateral is available to plaintiff, not only for the purpose of liquidating the debt to which it is held, but likewise for defraying the expense entailed in protecting it or reducing it to the payment of such debt. [See Lumber Co. v. Pollock, 139 N. C. 174, 51 S. E. 855; 31 Cyc. 826.] So it is, even though the jury finds that McNulty waived his rights in the premises, plaintiff may nevertheless recover, not only the amount of its debt and interest, if the horses be found of sufficient value, but enough, as well, beyond this, if there be additional value sufficient found, to compensate the expenses above pointed out, for obviously such would be its right in making a final settlement with McNulty, in event of a recovery of the full amount to which both plaintiff and McNulty were entitled. But in no event should plaintiff's recovery exceed the value of the collateral.

The judgment should be reversed, and the cause remanded to be proceeded with in accordance with the views above expressed. It is so ordered. *Reynolds, P. J.,* and *Allen, J.,* concur.