# E. A. MONTGOMERY, Respondent, v. JAMES C. DAVIS, Appellant.

### In the Kansas City Court of Appeals, April 3, 1922.

1. **APPEAL AND ERROR: Where Petition States a Cause of Action and Timely Objection to Allegations Thereof Was not Made in Trial Court the Same Cannot be Considered on Appeal.** Where petition states a cause of action, and timely objection was not made in trial court against allegations contained therein, objections or observations directed against the same on appeal cannot be considered.

2. **CARRIERS: Evidence Held to Show Agent of Carrier Was Correctly Informed as to Name of Consignee and the Transaction Contained All the Elements Necessary for a Binding Verbal Contract.** In an action for damages for negligent failure to deliver a shipment of cattle to the consignee as per contract, evidence *held* to justify court in finding that defendant's agent was correctly informed as to name of the consignee and that the facts and circumstances relating to the transaction contained all the elements necessary for a binding verbal contract.

3. ———: **Carrier Held not Justified in Assuming that Person in Charge of Shipment of Livestock Was Authorized to Sign Name of Owner to Written Contract Where Oral Contract Had Already Been Made With Owner.** The fact that owner's brother was in immediate charge at the time the stock were delivered to the carrier, while they were in transit, is not conclusive evidence that he was authorized to sign the owner's name to a contract of shipment, or authorized to have carrier's agent sign owner's name to written contract, nor is the carrier justified in assuming that he had such authority where an oral contract had already been made with the owner.

4. **APPEAL AND ERROR: In Absence of Findings of Law and Fact, Where Findings Were for Plaintiff, Question Whether Brother of Plaintiff Had Authority to Sign Contract as His Agent Held Presumed That Trial Court Considered the Question in View of Conclusion Reached.** In the absence of special findings of law and fact, where the findings were for plaintiff, it must be presumed that the trial court considered the question of whether the brother of plaintiff was his agent for the purpose of executing a written con-

Montgomery v. Davis.

tract, and that the court reached the conclusion that he was not such agent.

5. ———: Carrier Receiving Livestock for Shipment Advised of Name of Consignee, Under Duty to Transport and Deliver to Designated Consignee. Carrier having received the livestock for shipment and having been advised of the name of consignee was under duty of transporting and delivering said stock to designated consignee.

6. PRINCIPAL AND AGENT: Authority: Carrier Acting upon Advice and Instruction of Shipper's Agent Bound to Ascertain and Determine Extent of His Authority. The question of the negligence of the plaintiff's brother does not enter into the case, inasmuch as the testimony shows and the trial court held that he was the agent of the shipper only for the purpose of taking care of the cattle en route, and if carrier acted upon the advice and instruction of plaintiff's brother, it was the duty of carrier to ascertain and determine how far his authority extended.

7. ———: Evidence Held to Show Shipper's Brother Merely Agent for Purpose of Taking Care of Livestock While En Route. In an action by shipper against carrier for failure to deliver shipment of cattle to consignee, evidence held to show brother of shipper was his agent merely for purpose of taking care of livestock while en route.

8. WAIVER: Where Shipper's Caretaker Had no Knowledge of Wrongful Delivery of Cattle Until After Sale, Held There Was no Waiver of Shipper's Rights and Even if Caretaker Had been Clothed with Authority Therefor There Was Nothing in His Contract That Could be Construed as a Waiver of Defendant's Liability. Where plaintiff's caretaker did not learn of wrongful delivery of cattle until after they had been sold, and some of them delivered, held, there was no waiver of plaintiff's rights relative thereto and there was nothing in the contract of the caretaker, even if he had been clothed with authority therefor, that could be construed as a waiver of defendant's liability, since waiver is an intentional abandonment of a known right and there can be no waiver unless so intended by one party and so understood by the other.

9. CARRIERS: Waiver: Damages: Shippers Acceptance of Amount of Sale of Cattle to Wrong Consignee Does not Constitute a Waiver or Ratification of Diversion of Cattle as the Amount so Received is to be Held in Mitigation of Damages. The diversion of the cattle was not waived and ratified by plaintiff by his acceptance of the fruits of the sale thereof after he had been fully notified of the facts by his caretaker on the day the sale occurred, as the rule is

that where goods are delivered to the wrong person and sold and the shipper receives anything in payment therefor, the amount so received is to be held in mitigation of damages.

10. ———: Where Plaintiff's Agent was Merely Caretaker of Livestock While En Route, the Court Did not Err in Excluding Evidence as to Plaintiff's Experience as Stock Shipper and His Knowledge of the Requirements of Livestock Shipping Contracts. Where plaintiff's brother was not his agent, except to accompany shipment of cattle as caretaker, the trial court did not err in excluding evidence showing plaintiff's experience as a stock shipper and his acquaintance with the customary requirements with respect to livestock shipping contracts, on the theory that these facts tended further to establish that plaintiff intended that his brother, while acting as caretaker, should execute a shipping contract.

Appeal from the Circuit Court of Nodaway County.— Hon. *John M. Dawson*, Judge.

AFFIRMED.

*Wright & Ford* for respondent.

*W. D. Eaton* and *Shinabarger, Blagg & Ellison* for appellant.

ARNOLD, J.—This is a suit in damages for the negligent failure to deliver a shipment of cattle to the consignee as per contract.

Plaintiff is a farmer and stockman residing near Quitman, in Nodaway County, Missouri, and was engaged in the business of raising pure bred Aberdeen Angus cattle and disposing of the same for breeding purposes. Defendant Walker D. Hines (who was later substituted as defendant), was the Director General of Railroads in charge of the Chicago, Burlington & Quincy Railroad, over which road the shipment was made.

Plaintiff and his two neighbors, named Carden and Johnson, combined in one car lot their several parcels of mixed live stock, making an aggregate of 25 head of cattle and 12 hogs for shipment from the station at

Quitman to the Dailey Live Stock Commission Company at the stock yards at South St. Joseph, Mo.

An arrangement previously had been made by the parties with the commission company whereby the cattle were to be sold for breeding purposes, and the stock car in which the shipment was made had been previously ordered, through defendant's agent, for March 24, 1919. About 9 or 9:30 o'clock in the morning of that day, the plaintiff, his brother Joseph Montgomery, the neighbor and fellow-shipper Joseph Carden and the latter's foster son, Harry Morris, arrived at the railroad stock pens at Quitman, with the stock and placed them in the pens, preparatory to shipping them out on the local freight train within the next hour or two. Immediately following their arrival at the railroad station, Joseph Montgomery, Joseph Carden and Harry Morris went to inquire of the agent of defendant concerning the partitions they would be required to build in the car to separate the cattle from the hogs. Plaintiff testified he was not present on this mission, and in this he is corroborated by his brother and his two companions. The agent of defendant company at Quitman testified that plaintiff was present at that time.

At the conclusion of the conversation relative to the partitions, the agent of the railroad company asked to whom the stock was being shipped and who would accompany the shipment as caretaker. Joseph Montgomery replied that the stock was to be consigned to "Dailey" Live Stock Commission Company at St. Joseph. The agent testified that he understood him to say "Davis" and he accordingly made out the billing and shipping contract naming Davis & Son Live Stock Commission Company as consignee, with plaintiff, E. A. Montgomery, as consignor. These were the only shipping directions received or asked for by the railroad agent.

Joseph Montgomery, Carden and Morris then left the station and busied themselves about preparing the partitions and loading the stock which consumed approximately an hour.

At sometime during this hour plaintiff, as shown by the testimony, asked his brother Joseph and Carden if the railroad agent had been told to whom the stock was being sent and Joseph replied that he had told him. The railroad agent, during this time, went to plaintiff and asked him how many head of live stock were in the shipment. Plaintiff gave him the information and then asked the agent if he had been informed where the stock was to be shipped, and the agent answered that he had. About the time the loading of the stock was completed the freight train arrived, and the stock car was picked up.

A few minutes before the train pulled out, Joseph Montgomery, who was to accompany the cattle as caretaker, went to the station and signed his name as caretaker in the proper place on the shipper's contract, and received from the agent a duplicate carbon copy thereof and a voucher for his transportation on the train.

The railroad agent testified that at this juncture, he asked Joseph Montgomery where E. A. Montgomery was and stated that as E. A. Montgomery was named as consignor in the contract, he would have to sign it. To this, Joseph Montgomery replied "he is not here," or words of similar import, and directed the agent to sign E. A. Montgomery's name thereto, which he did.

Joseph Montgomery denied this and asserted the agent had said nothing to him about the necessity of having E. A. Montgomery's signature to the contract; that he accepted his carbon copy of the contract in the capacity of caretaker without reading it, on the supposition that E. A. Montgomery had signed it as consignor.

Joseph Montgomery then boarded the train and rode as far as Napier, a junction point about half way between Quitman and St. Joseph. The train was late and a' Napier he boarded a passenger train and rode thereon to St. Joseph. On his arrival he went to the railroad yard house and left instructions as to how the shipment should be unloaded and lotted. The stock was unloaded at 11:20 p. m.

The following morning at about 8:30, Joseph went to the offices of the Dailey Live Stock Commission Company and inquired about the stock. The company had heard nothing of it. Montgomery made repeated inquiries until about 11 a. m., when the Dailey Commission Company sent a man to examine a bulletin board and he reported that the shipment had been delivered to Davis & Son Commission Company.

Montgomery then went to the pens of Davis & Company and found seven of his brother's cattle in a pen, together with five or six of the cattle belonging to Carden and Johnson. He was told that the rest had been sold and sent to be slaughtered as butcher stuff and that those in the pens also had been sold.

He testified that he made no effort to secure the return of the cattle; and that he told the men there the cattle were pure bred and had been consigned to another commission company to be sold for breeding purposes and that he did not interfere with the disposal of the cattle which were not yet weighed. He waited until all the cattle were delivered and then went to the office of Davis & Son Live Stock Commission Company to see that the returns for the cattle were properly divided and remitted. He left the stock yards about one or two o'clock in the afternoon.

Richard R. Peters, a salesman for the Davis Company, testified that the stock in this shipment had been in the stock pens from about 8:30 that morning; that he sold the cattle about an hour later but held them in the pens until about 11 o'clock that morning, thinking the owner would appear. He then started them to the scales because the purchaser of the cattle demanded delivery, since they were sold by weight and the cattle were filling. This witness also testified that, under the rules and customs of the stock exchange at St. Joseph, the sale of cattle by mistake, as in the case of breeding cattle sold for beef, could be rescinded not only after they had been weighed, but at any time before they had gone into quarantine for government inspection.

The first amended petition charges that plaintiff, on the 24th day of March, 1919 ''entered into a contract with the defendant to ship and transport fourteen head of pure bred Aberdeen Angus cattle from said town of Quitman, Mo., to said City of St. Joseph, Mo., and to deliver the same to the Daily Live Stock Commission Co., at St. Joseph, Mo., and pursuant to said agreement the said defendant received said cattle for shipment and understook to ship and deliver the same as per agreement; that through the mistake, carelessness and negligence or inadvertence of the defendant, his agents, servants and employees, the said defendant failed and neglected to deliver the said cattle to the said consignee, but did deliver said cattle to another commission firm, who, without the knowledge, direction or consent of plaintiff, sold said cattle as slaughtering animals; that said fourteen animals consisted of three two-years-old bulls, three yearling bulls, two cows, five heifers and one calf; that the value of said two-year-old bulls, for breeding purposes, was $740, and the value of the three yearling bulls was $600, and the value of the two cows was $500, the value of the five heifers was $1000 and the value of the calf was $100; the total value of all the animals for breeding purposes being $2950; that said cattle were not prepared nor intended to be sold as slaughtering animals, and that by reason of their being so sold plaintiff realized only $1512.15; that by reason of the said cattle being sold for slaughtering purposes, as aforesaid, plaintiff was damaged in the sum equaling the difference between the amount realized and the value of the cattle as breeding animals, or $1417.85.''

The answer is, first, a general denial and as special defense, avers that plaintiff, or someone acting for him, directed the railroad agent to bill the stock as said agent understood and verily believed to be Davis & Son, commission merchants at St. Joseph stock yards; that without knowing that the parties intended to ship to anyone other than said Davis & Son, as consignee, he prepared

the live stock shipping contract, as directed by one of the shippers acting for himself and the other three, with their knowledge and consent, and that said agent of E. A. Montgomery directed said railroad agent to sign said contract in the name of E. A. Montgomery, consignor, which he, accordingly, did; that the said agent of the shippers accepted said contract as so prepared; that the name of Davis & Son had been erroneously inserted in said contract as consignee; that defendant duly transported said stock from Quitman to St. Joseph, Mo. stock yards· and delivered the same to Davis & Son, within reasonable time and in good order, pursuant to said written contract, in good faith and in the belief that the same expressed the agreement of the parties; that said contract was a valid and subsisting one; that the alleged verbal contract was superseded by the said written contract, and that plaintiff is estopped from denying the same; that if there was any loss the same was due to plaintiff's own negligence and carelessness, his agent and caretaker directly contributing thereto.

The reply was a general denial.

Under the pleadings thus made, the cause went to trial to a jury, but near the close of plaintiff's evidence, it becoming apparent there was no issue of fact involved, it was agreed between the parties that the jury be discharged and the cause submitted to the court, and accordingly this was done. The court found for plaintiff and entered judgment for him in the sum of $1417.85, without submitting any findings of law or fact.

A timely motion for a new trial was overruled by the court and defendant appeals.

Defendant attacks the petition on the ground,that it fails to state a cause of action for conversion, or *ex contractu,* and charges only common law negligence; (a) that the petition is not a good plea in conversion because it fails to allege either ownership, possession or right of the cattle in the plaintiff; (b) no cause of action *ex contractu* is pleaded because there is no allegation of

209 M. A.—45

a consideration for the contract set out; (c) that if
the petition is held good, it is in tort for trespass on the
case, based upon the common-law negligence of defendant
in failing to deliver the cattle in accordance with the
verbal contract of shipment alleged to have been made;
(d) the rules applicable to actions for trespass on the
case, and not those obtaining in actions for conversion,
should govern.

These objections, or observations, directed as they
are to the allegations in the petition, no objection there-
to having been timely made in the court below, may not
now be considered. The petition does not fail to state a
cause of action and therefore it is good for the purposes
of this review.

In his assignments of error, defendant's first conten-
tion is that the finding and judgment of the court are
against the law, the evidence, and the law under the evi-
dence.

In the consideration of this assignment, it is proper,
first, to determine whether there was a verbal contract
of shipment entered into between plaintiff and defendant.

The trial court, obviously, found there was such verb-
al contract of shipment entered into between the parties.
The facts leading up to this conclusion, as shown by the
record, are few and simple. Plaintiff arranged with the
Chicago, Burlington & Quincy Railroad Company to
transport a carload of live stock to St. Joseph, Mo. Just
when this arrangement was made is not clearly shown by
the evidence, but it is shown that the railroad company
furnished a car for this purpose; and the evidence further
shows that plaintiff shipped his stock on that day in
the car so furnished by the railroad company. The details
of preparing the car for the shipment were carried out
by the mutual words and actions of parties plaintiff and
defendant. The parties are in perfect accord as to the
facts relative thereto, up to the point of designating the
consignee. Defendant's agent in charge of its business at
Quitman testified that plaintiff's brother, Joseph Mont-

gomery, upon being asked to whom the cattle were to be consigned, said "Davis," while Joseph Montgomery testified that he said "Dailey" Live Stock Commission Company and in this, he is corroborated by the only other witnesses present, viz., Joseph Carden, one of the shippers, and by Harry Morris.

In this state of the evidence, it is clear that the court was justified in finding that defendant's agent was correctly told that the consignee was the Dailey Live Stock Commission Company. We find the facts and circumstances immediately relating to the transaction contain all the elements necessary for a binding verbal contract.

Furthermore, it appears from the evidence that the agent of defendant, at no time, asked the consignor for instructions as to the identity of the consignee, and upon being asked by plaintiff if he had been informed as to this matter, stated that he had been so informed. It must be conceded that it was solely the shipper's right to name the consignee.

In the case of Atchison, Topeka & Santa Fe Railroad Company v. Watson, 71 Kansas, 696, it was held, in effect, that the fact that a person was in immediate charge at the time the stock were delivered to the carrier, and while they were in transit, is not conclusive evidence that he was authorized to sign the owner's name to a contract of shipment, nor is the carrier justified in assuming that he had such authority where an oral contract had already been made with the owner.

In the case at bar, the facts are stronger in plaintiff's favor than in the Watson case. The testimony shows that plaintiff's brother did not sign the written contract. Defendant urges that Joseph Montgomery authorized defendant's agent to sign plaintiff's name to the written contract. Applying the rule announced in the Watson case, it must be held that if plaintiff's brother was without direct authority therefor, he could not bind plaintiff by signing plaintiff's name to the written contract, much less could he authorize defendant's agent to sign it. We

therefore hold that the written contract herein, signed by defendant's agent, did not supersede any prior oral contract of shipment entered into with plaintiff and was, in fact, in the light of the record, no contract.

In the absence of special findings of law and fact in this case, it must be presumed that the trial court considered the question of whether the brother of plaintiff was his agent for the purpose of executing a written contract, and that he reached the conclusion that he was not such agent.

Defendant, having received the live stock for shipment and having been advised of the name of the consignee, was then under the duty of transporting and delivering said stock to the designated consignee.

We hold that the question of negligence of Joseph Montgomery does not enter into the case, inasmuch as the testimony tends to show and the trial court doubtless, held, that he was the agent of the shipper only for the purpose of taking care of the cattle en route. If defendant acted upon the advice and instruction of Joseph Montgomery—which the testimony does not conclusively show —it was the duty of defendant to ascertain and determine how far his authority extended. This principle of law is so well established that citations of authority are unnecessary.

Defendant urges that plaintiff admitted on the witness stand that his brother Joseph was his agent. This contention refers for its basis to the cross examination of plaintiff, as follows:

"Q. Well, I thought you said awhile ago that you asked Joe if he had seen about that? A. No sir.

"Q. Didn't you ask Joe if he had told the agent to have them billed to Daily? A. Joe and Mr. Carden were standing there together, and I asked Joe, I said, 'Did anyone tell Hickerson where to send this stuff?'

"Q. Well, Joe was your representative, wasn't he? A. Well, I guess he was.

Mr. Ellison: That is all."

It is clear that this is no admission that Joseph Montgomery was plaintiff's agent for any purpose other than as caretaker. The trial court rightly so decided and its holding relative thereto will not be disturbed.

This ruling also applies to defendant's contention that the caretaker's duties were enlarged to the extent of placing upon him the duty of correcting the error of defendant in delivering the cattle to the wrong party. It is settled law that any knowledge the caretaker may have gained of the wrongful delivery of the shipment could not have affected the liability of the carrier. [People's State Saving Bank v. Railroad, 192 Mo. App. 614; Southern Railroad Co., v. Webb, 143 Ala. 304.]

Plaintiff contends, and rightfully so, we think, that, as the caretaker did not learn of the wrongful delivery of the cattle until after they had been sold, and some of them delivered, there was no waiver of plaintiff's rights relative thereto. There was nothing in the contract of the caretaker, even if he had been clothed with authority therefor, that could be construed as a waiver of defendant's liability. A case in point is Hines, Director General, v. Jordan, 228 S. W. (Tex.) 633, wherein it was held that waiver is an intentional abandonment of a known right. There can be no waiver unless so intended by one party and so understood by the other. There was no waiver, in the case at bar, of plaintiff's rights in the premises.

We have carefully examined defendant's citations upon the points hereinabove referred to, and find that while they are good law, they are not in point under the testimony of record, and the theory upon which the case was tried and determined by the court.

Defendant further urges that the diversion of the cattle was waived and ratified by plaintiff by his acceptance of the fruits of the sale thereof after he had been fully notified of the facts by his brother, the caretaker on the day the sale occurred.

We cannot accept this line of reasoning as conclusive. It is a well settled rule of law that where goods

are delivered to the wrong person and sold, and the shipper receives anything in payment therefor, the amount so received is to be held in mitigation of damages. [Keota Produce Co. v. Railroad, 179 N. W. (Ia.) 934.] In the case at bar, the value of the cattle for breeding purposes was fixed at $2950, the net proceeds from their sale for slaughter was $1532.15, which the court deducted from the proved value, and rendered its verdict for $1417.-85, pursuant to the above rule.

Finally defendant urges that it was error for the court to exclude evidence showing plaintiff's experience as a stock shipper and his acquaintance with the customary requirements with respect to live stock shipping contracts, because these facts tended further to establish that plaintiff intended his agent, Joseph Montgomery, to execute a shipping contract.

Under the obvious ruling of the court below, in which this court concurs, to the effect that plaintiff's brother, Joseph, was not plaintiff's agent, except to accompany the cattle as caretaker, we cannot accept this contention as having any force. It follows that the citations in sup · port thereof are inapplicable.

We fail to find any reversible error in the case. The judgment was for the right party and is affirmed.

All concur.